# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| SHARON JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17 C 8878 |
| | ) | |
| MEGAN J. BRENNAN, Postmaster General, | ) | Judge Rebecca R. Pallmeyer |
| United States Postal Service, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sharon Johnson has worked for the United States Postal Service (USPS) in the Chicago area for more than 25 years, initially as a mail processing clerk and, at all times relevant to this lawsuit, as a sales service and distribution clerk. Johnson was diagnosed with anxiety and depressive disorder in March 2011. She has sued Defendant Megan J. Brennan, the Postmaster General of USPS, for alleged discrimination on the basis of those disabilities, in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12111 et seq.[1] Specifically, Johnson claims that her supervisors at the Lincoln Park post office discriminated against her by (1) failing to provide an accommodation in 2013; (2) having the postal police escort her from the premises and putting her on emergency placement status on September 9, 2013; (3) mocking her disabilities; and (4) depriving her of sharp tools that she needs to do her job.[2] Defendant now moves for

---

[1] Because the ADA does not apply to federal agencies, the court treats Johnson's claims as arising under the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq. See Hancock v. Potter*, 531 F.3d 474, 478 n.4 (7th Cir. 2008); *Dyrek v. Garvey*, 334 F.3d 590, 597 n.3 (7th Cir. 2003). "In determining whether a violation of the Rehabilitation Act occurred in the employment context," courts use "the standards set out in the ADA." *Dyrek*, 334 F.3d at 597 n.3; *see also, e.g.*, *Sansone v. Brennan*, 917 F.3d 975, 979 n.1 (7th Cir. 2019); *Scheerer v. Potter*, 443 F.3d 916, 918-19 (7th Cir. 2006).

[2] Johnson's original complaint alleged, in addition, that Defendant violated the ADA by (1) releasing her medical information to third parties (*see* Compl. [1], Count II) and (2) intentionally inflicting emotional distress through disability-related harassment (*see id.*, Count III). The court dismissed Count II without prejudice on August 6, 2018, noting that the parties failed to

summary judgment on the remaining claims. For the reasons discussed below, Defendant's motion is denied.

## BACKGROUND

Johnson has worked for USPS since September 1994. (Pl.'s L.R. 56.1 Resp. [51] ¶ 2.) She began as a mail processing clerk, meaning that she "[p]rocess[ed] . . . letters on the automation machine." (Johnson Deposition Transcript ("Johnson Dep."), Ex. C to Pl.'s L.R. 56.1 Stat. [51-4], 8:7-15.) In June 2006, Johnson moved into her current role as a sales service and distribution clerk. (*Id.* at 10:10-14, 10:25-11:3; *see also* Pl.'s L.R. 56.1 Resp. ¶ 2.) Her duties include processing letters and packages and working at the "service window" selling stamps and other postal products. (Pl.'s L.R. 56.1 Resp. ¶ 2.) Johnson has worked at several post offices in the Chicago area. She currently works at the Morgan Park location (*see id.*), but the events relevant to this lawsuit occurred primarily at the Lincoln Park location, where Johnson worked from roughly June 2006 to October 2013. (*See id.* ¶ 14; Johnson Dep. 10:10-24.)

In March 2011—shortly after an incident with a supervisor that is unrelated to this case— Johnson was diagnosed with anxiety and depressive disorder. (Pl.'s L.R. 56.1 Resp. ¶ 3.) Defendant agrees that anxiety and depressive disorder qualify as disabilities under the ADA (*see, e.g.*, Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mot.") [44], 4-6), and Johnson's Rehabilitation Act claims are based on these disabilities.

According to Johnson, between September 2012 and March 2013, USPS received three letters from her doctor concerning her anxiety and depressive disorder. (*See* Pl.'s L.R. 56.1 Stat. [51] ¶¶ 8-10.) In two of the letters, Johnson's doctor wrote that she was experiencing "stress, anxiety and depression related to stress on the job." (Sept. 17, 2012 Ltr., Ex. G to Pl.'s L.R. 56.1

----

address whether there is a private right of action under the Health Insurance Portability and Accountability Act of 1996 (HIPAA). (Order [28].) The court dismissed Count III "without prejudice to Plaintiff's recovering damages that include any emotional distress she suffered for violation of her rights under ADA." (*Id.*) Johnson has not renewed these claims.

Stat. [51-8], PL000869; Feb. 22, 2013 Ltr., Ex. G to Pl.'s L.R. 56.1 Stat. [51-8], PL000870.)  In the third letter, Johnson's doctor wrote that her "stress on the job is related to interactions with her managers and supervisors."  (Mar. 8, 2013 Ltr., Ex. G to Pl.'s L.R. 56.1 Stat. [51-8], PL000871.) The doctor appears to have written the letters to confirm that certain work absences were health-related.  (*See* Feb. 22, 2013 Ltr. PL000870 ("Kindly excuse [Johnson's] absence from work as she was incapacitated . . . ."); Sept. 17, 2012 Ltr. PL000869 and Mar. 8, 2013 Ltr, PL000871) (confirming that Johnson was "under [the doctor's] care" and "incapacitated").)  Defendant disputes that it received these letters, but "admits that Johnson told her psychologist that her anxiety and depression are related to her interactions with her supervisors." (*See* Def.'s L.R. 56.1 Resp. [57] ¶¶ 8-10.)

## A.    The May 15, 2013 Anxiety Attack and Subsequent Medical Leave

Johnson suffered an anxiety attack on May 15, 2013 while she was working at the Lincoln Park post office.  (Pl.'s L.R. 56.1 Resp. ¶ 4.)  In a USPS accident report concerning the incident, Johnson stated that her immediate supervisor, Rondell Saddler, had been "waiting for [her] by the cage area to ask her where had she been for 40 minutes."[3]  (May 29, 2013 Accident Report, Ex. O to Pl.'s L.R. 56.1 Stat. [51-16], PL000313.)  According to Johnson, "Saddler's actions caused [her] mental stress and made her fear for her safety."  (*Id.*)  Johnson went to the emergency room and was treated for an "anxiety problem."  (May 15, 2013 SJH Emergency Dep't Record, Ex. H to Pl.'s L.R. 56.1 Stat. [51-9], 1; *see* Pl.'s L.R. 56.1 Resp. ¶ 4.)  She went on medical leave from May 15, 2013 through September 3 or 4, 2013.  (Pl.'s L.R. 56.1 Resp. ¶ 5.)  During that time, Johnson completed an "intensive outpatient program where she was prescribed different medication than what she was currently taking to treat her anxiety and depression."  (Def.'s L.R. 56.1 Resp. ¶ 17.) Citing a letter from an outpatient facility written "[t]o whom it may concern," Johnson contends that USPS had a record of her participation in the outpatient program.  (*See* Pl.'s L.R. 56.1

---

[3]       The parties do not explain what the "cage area" is.

Stat. ¶ 18; May 24, 2013 Ingalls Memorial Hospital Ltr., Ex. I to Pl.'s L.R. 56.1 Stat. [51-10].)[4]

Defendant disputes that USPS had any such record. (*See* Def.'s L.R. 56.1 Resp. ¶ 18.)

Johnson testified at her deposition that before the May 15, 2013 anxiety attack, she had made verbal requests to Saddler's supervisor—Janice Hall—to be transferred away from Saddler because of "unfair treatment and a hostile work environment." (Johnson Dep. 35:18-36:9.) The first time Johnson had a doctor "back . . . up" that request, she testified, was on May 20, 2013—while she was on medical leave. (*Id.* at 35:9-20; *see also* Pl.'s L.R. 56.1 Stat. ¶ 33 ("Johnson requested in writing in May of 2013 to be transferred away from supervisor Saddler as a reasonable accommodation . . . .").) By Defendant's account, May 20, 2013 is the date on which Johnson first requested a transfer as a "reasonable accommodation" for her anxiety and depressive disorder. (*See* Def.'s L.R. 56.1 Stat. [45] ¶ 13.) The parties agree that "Hall became aware of Johnson's medical condition on or around May or June of 2013." (Def.'s L.R. 56.1 Resp. ¶ 12.) Johnson testified that when she asked Hall for a transfer on May 20, 2013, Hall said "she would have to get back with [her]." (Johnson Dep. 36:17-23.)

Johnson contends that she followed up on her request several times while she was on medical leave from May 15, 2013 to September 3 or 4, 2013. (*See, e.g.*, Pl.'s L.R. 56.1 Resp. ¶ 13 (maintaining that she made phone calls to Hall and that her doctor sent notes to USPS during that time).) In support, she has submitted, among other things, her own handwritten notes describing phone calls she made to Hall while on leave. (*See* Handwritten Notes, Ex. B to Pl.'s L.R. 56.1 Stat. [51-3], PL00063-64.) Johnson has also submitted a "progress note" in which her doctor wrote, "It would help a lot if [Johnson] could be re-assigned to a different area in the post office as she really has a very difficult time with some of her supervisors in the present job." (June 11, 2013 Progress Note, Ex. G to Pl.'s L.R. 56.1 Stat. [51-8], PL000560.) Finally, she has submitted

---

[4]     The bottom right corner of the letter is stamped, "Rec'd Date: 07/17/2013," but does not identify the recipient. (*See* May 24, 2013 Ingalls Memorial Hospital Ltr.)

a letter from the same doctor dated July 2, 2013, that states, "[Johnson] should be considered for a different location when she is released for work." (July 2, 2013 Ltr., Ex. G to Pl.'s L.R. 56.1 Stat. [51-8], PL000155.) The "progress note" appears to be an internal hospital record, and the July 2, 2013 letter is addressed to the Office of Workers' Compensation Program in London, Kentucky. (*See* June 11, 2013 Progress Note PL000560; July 2, 2013 Ltr. PL000155.)[5] Defendant appears to dispute that USPS received either document. (*See* Def.'s L.R. 56.1 Resp. ¶¶ 11, 19.) But Defendant concedes that at some point during Johnson's medical leave, her doctor "recommended that she be reassigned to a different area because [she] has a difficult time with almost every supervisor she has been assigned to." (*Id.* ¶ 19.) Johnson returned to work at the Lincoln Park post office on September 3 or 4, 2013. (Pl.'s L.R. 56.1 Resp. ¶ 5.) Defendant had not yet granted her request to be transferred to a different location. (Def.'s L.R. 56.1 Resp. ¶ 33.)

## B. Alleged Harassment

Johnson testified that Saddler and Deundra Campbell (another supervisor) harassed her at work "[o]n a frequent basis" by saying things like, "Oh, you was in the crazy house" and "Did you take your medication?" (Johnson Dep. 57:3-58:12.)[6] Saddler and Campbell deny these allegations. (*See* Campbell Decl., Ex. 1 to Def.'s L.R. 56.1 Resp. [57-1], ¶¶ 3-4; Saddler Decl., Ex. 3 to Def.'s L.R. 56.1 Resp. [57-3], ¶¶ 4-5; *see* Def.'s L.R. 56.1 Resp. ¶ 20.) According to Hall—who supervises all three employees—Johnson informed her around May or June 2013, "that she suffered from anxiety attacks which were causing her to have outbursts . . . and disrespect other employees," and "noted that her condition required her to take her medication." (Hall Decl., Ex. 2 to Def.'s L.R. 56.1 Resp. [57-2] ¶ 4.) Hall acknowledges that she herself asked

---

[5] The parties do not explain why Johnson's doctor would correspond with a workers' compensation program located in Kentucky.

[6] Johnson's deposition testimony suggests that the alleged harassment occurred after she had an anxiety attack on May 15, 2013. (*See id.* at 57:3-10.) Because Johnson was on medical leave from May 15, 2013 through September 3 or 4, 2013, the court assumes Johnson is alleging that Saddler and Campbell made these harassing remarks in September 2013.

Johnson "if she was taking her medication" and explains that she did so "out of concern for" Johnson and others. (*Id.*; *see* Def.'s L.R. 56.1 Resp. ¶ 20.)

Johnson also testified that Saddler and Campbell took away sharp tools that are necessary to perform her job duties—scissors, letter openers, and the like—and that she believed they did so "because I was in the mental facility" and "[t]hey felt I was a threat to others." (Johnson Dep. 52:20-53:19; *see* Pl.'s L.R. 56.1 Stat. ¶ 22.) Saddler and Campbell deny that they removed Johnson's tools. (Campbell Decl. ¶ 10; Saddler Decl. ¶ 9; *see* Def.'s L.R. 56.1 Resp. ¶ 22.)

**C.     September 9, 2013 Incident**

Johnson and Defendant provide markedly different accounts of an incident that occurred on September 9, 2013. Johnson testified that on that day, she told Campbell that she "couldn't work . . . under Rondell Saddler" because he was creating a "hostile work environment." (Johnson Dep. 31:11-32:1.) Johnson further testified that she gave Campbell a doctor's note stating the same. (*See id.* at 31:19-32:1; *see* Pl.'s L.R. 56.1 Stat. ¶ 24.) According to Johnson's testimony, after that conversation, Campbell went upstairs and Johnson thought that she was making copies of the doctor's note. (Johnson Dep. 32:2-4; *see* Pl.'s L.R. 56.1 Stat. ¶ 24.) About 30 minutes later, to Johnson's surprise, postal police arrived. (Johnson Dep. 32:5-8, 16; 33:14-18; *see* Pl.'s L.R. 56.1 Stat. ¶ 24.)

According to Defendant's account of the episode, Johnson became upset after Saddler asked her to scan packages. (Def.'s L.R. 56.1 Stat. ¶ 6.) She told Campbell that she "did not want Saddler to be her supervisor anymore, or to talk to her or give her any instruction." (*Id.*) Then, Johnson told Campbell that she carries mace and a knife, and that if Saddler confronted her again, there would be a fatality in the building. (*Id.* ¶ 7.) Campbell told Hall about the threat, and Hall directed Campbell to call the postal police. (*Id.* ¶ 9; Def.'s L.R. 56.1 Resp. ¶ 26.) Defendant supports this version of events with, among other things, sworn affidavits from Campbell and Saddler and a USPS investigative memorandum. (*See* Campbell EEOC Investigative Affidavit, Ex. 4 to Def.'s L.R. 56.1 Stat. [45-4], ¶ 13 (stating that Johnson told her, "if

[Saddler] says something to me there is going to be a fatality in this building.  You know that I carry mace and I carry a knife"); *id.* (stating that Johnson "did not say this to anyone but me. When I heard that I called Ms. Hall"); Oct. 9, 2013 USPS Investigative Memorandum, Ex. 3 to Def.'s L.R. 56.1 Stat. [45-3], ¶ 3 (recounting similar report from Campbell); Saddler EEOC Investigative Affidavit, Ex. 2 to Def.'s L.R. 56.1 Stat [45-2], ¶ 10 ("Ms. Campbell told me that Ms. Johnson threatened bodily harm to me, but Ms. Johnson never said anything to me, she only told Ms. Campbell.").)  Defendant also maintains that when USPS investigators asked Johnson about the threats she made, Johnson stated, "Some things I've said, I don't know I said" and "[I] [d]id not mean it."   (Def.'s L.R. 56.1 Stat. ¶ 8 (quoting Oct. 9, 2013 USPS Investigative Memorandum ¶ 7).)

Johnson denies that she threatened a fatality or told Campbell that she carries mace and a knife.  (*See* Pl.'s L.R. 56.1 Resp. ¶ 7; Johnson Dep. 30:17-31:7.)  She testified that after she told Campbell she could no longer work with Saddler, *Campbell* stated, "What are you going to do, get a gun, knife, or use your mace?"  (Johnson Dep. 70:18-22; Pl.'s L.R. 56.1 Resp. ¶ 7.)  Johnson provided a similar version of events to USPS investigators who interviewed her at her residence three days after the incident.  (*See* Sept. 12, 2013 Memorandum of USPS Interview, Ex. D to Pl.'s L.R. 56.1 Stat. [51-5], 1 (stating that, according to Johnson, Campbell said, "How can you fear Rondell [Saddler]?  You have a knife, mace and a 'g' [gun]" (alterations in original)); Pl.'s L.R. 56.1 Resp. ¶ 8.)

It is undisputed that when the postal police arrived, they asked Johnson to empty her pockets.  (Pl.'s L.R. 56.1 Resp. ¶ 10.)  Johnson complied and removed a bottle of mace.  (*Id.*)  The police also searched Johnson's car, where they found a knife in her purse.  (*Id.*)  The police then "escorted Johnson out of the facility and told her that she represented a threat to other employees."  (*Id.* ¶ 11.)  At Hall's direction, Campbell put Johnson on "emergency placement," which is a "non-work status," from September 9 to September 27, 2013.  (*Id.*; *see also* Def.'s L.R. 56.1 Resp. ¶ 26; Hall EEOC Investigative Affidavit, Ex. 5 to Def.'s L.R. 56.1 Stat. [45-5], ¶ 11.)

Johnson returned to work on September 27, 2013. (Pl.'s L.R. 56.1 Resp. ¶ 14.) Thereafter, Defendant granted her request to be transferred to a different post office. (*Id.*) Johnson "was . . . transferred" to the Lakeview post office "[i]n October 2013." (*Id.*) She testified that she was transferred three more times, most recently to the Morgan Park post office, where she works today. (*See* Johnson Dep. 21:14-23:17.)

## D.    January 17, 2014 EEO Complaint

On January 17, 2014 Johnson filed a complaint with the EEOC. (Pl.'s L.R. 56.1 Resp. ¶ 18.) She claimed that Defendant discriminated against her because of her anxiety and depressive disorder by (1) having the postal police escort her from the Lincoln Park post office on September 9, 2013, and putting her on emergency placement, and (2) denying her requests for an accommodation. (*See id.*; *see also, e.g.*, Sept. 7, 2017 EEOC Decision, Ex. 11 to Def.'s L.R. 56.1 Stat. [45-11], 1.) Johnson mentioned in the EEOC complaint that Hall, Campbell, and Saddler were "aware that I was working in a hostile work environment with [sic] being harassed daily" and that "doctors [sic] statements were presented to management." (Jan. 2014 EEOC Compl., Ex. 9 to Def.'s L.R. 56.1 Stat. [45-9], 1.) The administrative judge (AJ) "issued a decision by summary judgment in favor of" USPS, and USPS issued a final order adopting the AJ's "finding that [Johnson] failed to prove discrimination as alleged." (Sept. 7, 2017 EEOC Decision 1-2.) Johnson timely filed an appeal. (*See id.* at 2.) On review, the EEOC "conclude[d] that the AJ correctly determined that the preponderance of the evidence did not establish that [Johnson] was discriminated against by [USPS] as alleged." (*Id.*) Thus, the EEOC affirmed USPS's final order adopting the AJ's decision. (*Id.*)[7]

_____

[7]    In its Local Rule 56.1 Statement, Defendant characterizes the EEOC's decision as follows: "After an administrative hearing, the [EEOC] found that the Postal Service did not discriminate against Johnson when she was escorted out of the post office, given that she made a threat of violence against a supervisor . . . . Further, the EEOC found that the Postal Service accommodated her request for a transfer shortly after her return to work following her leave of absence." (Def.'s L.R. 56.1 Stat. ¶ 19.) The EEOC decision does not contain these detail, (*see generally* Sept. 7, 2017 EEOC Decision), but Johnson does not dispute Defendant's description. (*See* Pl.'s L.R. 56.1 Resp. ¶ 19.)

## DISCUSSION

To prevail on a motion for summary judgment, the moving party must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party "bears the burden of demonstrating the absence of genuine issues of material fact." *LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th Cir. 2019). "If that occurs, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks omitted). When ruling on a motion for summary judgment, a court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Anderson*, 477 U.S. at 255; *see also, e.g.*, *Rowlands v. United Parcel Serv.– Fort Wayne*, 901 F.3d 792, 798 (7th Cir. 2018). A court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts on summary judgment, and must avoid[] the temptation to decide which party's version of the facts is more likely true." *Rowlands*, 901 F.3d at 798 (internal quotation marks omitted).

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Similarly, the Rehabilitation Act prohibits discrimination against a "qualified individual with a disability . . . solely by reason of her or his disability." 29 U.S.C. § 794(a); *see Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504-05 (7th Cir. 2017). "Aside from the 'solely by reason of' standard of causation . . . the Rehabilitation Act incorporates the standards applicable to Title I of the ADA." *Monroe*, 871 F.3d at 504-05 (internal quotation marks omitted).[8] "[D]isability discrimination under the Rehabilitation Act . . . can be established in three

---

[8]     The parties do not acknowledge this distinction, or that the Seventh Circuit has construed both the ADA and the Rehabilitation Act to require proof of but-for causation. *See A.H. ex rel. Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587, 593 (7th Cir. 2018).

different ways:  (1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people."  *A.H. ex rel. Holzmueller*, 881 F.3d at 592-93 (internal quotation marks omitted).

## A.      Reasonable Accommodation

Johnson claims that Defendant discriminated against her by failing to provide the accommodation that she requested:  a transfer away from supervisor Saddler.  To prevail on a failure-to-accommodate claim under the Rehabilitation Act, Johnson must show (1) she "was a qualified individual with a disability," (2) her employer "was aware of her disability," and (3) the employer "failed to reasonably accommodate her disability."  *Yochim v. Carson*, 935 F.3d 586, 590 (7th Cir. 2019); *see also id.* at 591 (noting parallel requirements in the ADA).  "The accommodation obligation . . . brings with it a requirement that both the employer and the employee engage in a flexible 'interactive process' and make a 'good faith effort' to determine what accommodations are necessary."  *Id.* (quoting *Lawler v. Peoria Sch. Dist. No. 150*, 837 F.3d 779, 786 (7th Cir. 2016)).    An employer, however, need only provide a "reasonable accommodation, not the accommodation [the employee] would prefer."  *Yochim*, 935 F.3d at 591 (internal quotation marks omitted).

There is no dispute that Johnson "was a qualified individual with a disability."  *Id.* at 590; *see generally* Def.'s Mot. 4-6.  Defendant, moreover, admits that it knew of Johnson's disabilities by May 20, 2013, when, according to Defendant, Johnson first requested to be transferred away from Saddler as an accommodation.  (*See* Def.'s Mot. 5.)  Defendant argues that no reasonable jury could find in Johnson's favor on her failure-to-accommodate claim because it in fact granted Johnson's request for a transfer.  (*See id.*)  Defendant emphasizes that Johnson requested the accommodation while she was on leave; she remained on leave until September 3 or 4, 2013; she was away from work on "emergency placement" between September 9 and 27, 2013; and Defendant transferred her to the Lakeview post office in early October 2013, just "a few days" after she returned to work from emergency placement.  (*Id.* at 5; *see also* Def.'s Reply [56], 4

(contending that there was "no reason" to transfer Johnson while she "was not at work").)

Johnson argues that there is a genuine issue for trial on this claim because Defendant "ignored her request for over a year."  (Pl.'s Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Opp.") [52], 5; *see also id.* (maintaining that she made "multiple request[s] for a reasonable accommodation as early as September 2012").)  Johnson's requested accommodation was a transfer away from the Lincoln Park post office because, according to Johnson, Saddler mocked her disabilities and treated her unfairly.  The evidence does not support Johnson's claim that she made that request as early as September 2012.  For example, even assuming that USPS received Johnson's doctor's notes dated September 17, 2012, February 22, 2013, and March 8, 2013, the notes did not request an accommodation.  (*See* Ex. G to Pl.'s L.R. 56.1 Stat. PL000869-71.)  Rather, they stated that Johnson was experiencing "stress, anxiety and depression relating to stress on the job" and "interactions with her managers and supervisors," and stated that Johnson's absences from work on certain dates should be excused.  (*See* Ex. G to Pl.'s L.R. 56.1 Stat. PL000869-71.) In addition, Johnson herself asserts that supervisor Hall "became aware of [her] medical condition on or around May or June of 2013," not in September 2012.  (Pl.'s L.R. 56.1 Stat. ¶ 12.)  And Johnson states—albeit without any cite to the record—that "Campbell . . . receive[d] [her] medical documentation as early as May 2013 and some additional documents on September 9, 2013." (Pl.'s Opp. 10.)

Viewing the record in the light most favorable to Johnson, she and/or her doctor did make several requests for the accommodation beginning in May 2013.  Defendant did not provide the accommodation until early October 2013.  The question, then, is whether a jury could conclude that Defendant did not act reasonably in delaying for five months before providing the requested accommodation.  Defendant correctly notes that "the law does not require that an employer provide the exact accommodation that is requested."  (Def.'s Mot. 5 (citing, *inter alia*, *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 546 (7th Cir. 2008); *Jay v. Intermet Wagmer, Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000).)  But Defendant does not suggest that it offered some other accommodation

at an earlier time. It maintains only that it provided an accommodation eventually. Defendant's argument ignores that "unreasonable delay in providing an accommodation can provide evidence of discrimination" where the employer does not act "reasonably and in good faith." *Jay*, 233 F.3d at 1017.

In *Jay*, where the plaintiff requested a reassignment to a different position, the court determined that a 20-month delay did not render the accommodation unreasonable because there was evidence that the defendant "considered [the plaintiff] for reassignment . . . on a weekly basis" and offered him a new position "as soon as [it] became available." *Id.* Similarly, in *Cloe v. City of Indianapolis*, 712 F.3d 1171 (7th Cir. 2013), *overruled on other grounds by Ortiz v. Werner Enters.*, 834 F.3d 760, 764 (7th Cir. 2016), the court determined that a five-month delay was not unreasonable where the defendant provided several interim accommodations that turned out to be "insufficient." *Cloe*, 712 F.3d at 1177-79. And although the defendant in *Cloe* appears to have provided no accommodation during the first three months of the period of delay, there is no indication that the defendant was acting in bad faith. *See id.*

The evidence in this case permits an inference that Defendant completely ignored multiple requests for an accommodation for approximately five months. (*See* Pl.'s Opp. 5.) Defendant does not deny this. Furthermore, Defendant has provided no evidence that it took any steps to address Johnson's request while she was on leave for a condition Defendant knew was related to "stress on the job." Nor does Defendant identify circumstances that precluded it from timely addressing the request or maintain that granting Johnson's request for a change in supervisors would not have meaningfully improved her working conditions. (*See* Def.'s Mot. 5 (citing *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 577 (7th Cir. 2001), for the proposition that the ADA requires employers "to make whatever accommodations are reasonably possible in the circumstances"); Def.'s Mot. 5 (citing *Vande Zande v. State of Wisconsin Department of Administration*, 44 F.3d 538, 542-43 (7th Cir. 1995), for the proposition that an employer is not "required to expend

enormous sums in order to bring about a trivial improvement in the life of a disabled employee").)[9] Defendant does not even argue that providing the accommodation to Johnson immediately upon her return from leave on September 3 or 4, 2013 would have been burdensome. These circumstances—considered alongside Johnson's testimony that two of her supervisors ridiculed her—would permit a jury to conclude that Defendant failed to engage "reasonably and in good faith" in the "interactive process" concerning the accommodation. *Yochim*, 935 F.3d at 591; *Jay*, 233 F.3d at 1017. A jury, therefore, could return a verdict in favor of Johnson on her failure-to-accommodate claim.

Defendant appears to maintain that despite the delay, the eventual accommodation was reasonable (and perhaps generous) given that Johnson threatened to kill her supervisor. (*See* Def.'s Mot. 5, 6.) But as the court discusses below, a jury reasonably could conclude from the evidence that Johnson made no such threat. And even if a jury found otherwise, the alleged threat occurred four months into the five-month delay and does not alter the court's conclusion that the delay was unreasonable. The court denies Defendant's motion for summary judgment on Johnson's failure-to-accommodate claim.

**B.** **Disability Discrimination – September 9, 2013 Events**

Johnson also claims that Defendant discriminated against her when, on September 9, 2013, it called the postal police, had her escorted from the facility, and put her on emergency placement. To prevail on this claim, Johnson must show that (1) she "is disabled"; (2) she "is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation"; and (3) "the adverse job action was caused by [her] disability." *Monroe*, 871 F.3d at 503; *see also id.* at 503-05 (applying this standard to claims that employer violated the ADA, 42 U.S.C. § 12112(a), and the Rehabilitation Act).

Previously, courts spoke of using "direct" and "indirect" methods to prove this type of claim.

---

[9]     Defendant does not discuss the facts in these cases, so neither will the court.

*See Ortiz*, 834 F.3d at 765. But the Seventh Circuit has instructed district courts to "stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards." *Id*. Courts should instead consider the evidence "as a whole" to determine whether it "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the . . . adverse employment action." *Id*.; *see Monroe*, 871 F.3d at 504 (applying *Ortiz* to claims brought under the ADA and the Rehabilitation Act). This directive does not preclude courts from applying the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), however. *See Ortiz*, 834 F.3d at 766; *see also David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) ("As we have explained, both before and after *Ortiz*, *McDonnell Douglas* is a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases"—but it is "not the only way to assess circumstantial evidence of discrimination").

Because Johnson "has presented her argument" in terms of the *McDonnell Douglas* burden-shifting framework, the court will begin by employing that framework to determine whether Johnson "has established a prima facie case of discrimination." *David*, 846 F.3d at 224. Under *McDonnell Douglas*, "the plaintiff has the initial burden of establishing that (1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employer['s] legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer." *David*, 846 F.3d at 225 (internal quotation marks omitted). "If the plaintiff satisfies that burden, then the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id*. (internal quotation marks omitted). Defendant does not dispute that Johnson is a member of a protected class, nor that it took an adverse employment action against her on September 9, 2013. (*See,*

14

*e.g.*, Def.'s Mot. 7.)  But Defendant maintains that Johnson cannot establish a prima facie case of discrimination because "she cannot show that she was meeting her employer's legitimate expectations, or that similarly situated employees were treated more favorably."  (*Id.*)

Defendant's challenge to the adequacy of Johnson's job performance is aimed at the September 9, 2013 incident.  Defendant argues that because Johnson told Campbell she had mace and a knife and threatened "a fatality in the building," no reasonable jury could conclude that she was meeting USPS's legitimate job expectations.  (*Id.* at 8.)  Johnson denies that she referenced weapons or made a threat, however.  (*See, e.g.*, Pl.'s Opp. 9-10.)  According to Johnson, she merely told Campbell that she could no longer work with Saddler, at which point, *Campbell* stated, "What are you going to do, get a gun, knife, or use your mace?"  (Johnson Dep. 70:18-22; *see also* Pl.'s L.R. 56.1 Resp. ¶ 7; Sept. 12, 2013 Memorandum of USPS Interview 1.) Campbell and Sadder, moreover, concede that Campbell was the only person who heard the alleged threat.  (*See* Campbell EEOC Investigative Affidavit ¶ 13; Saddler EEOC Investigative Affidavit ¶ 10).)  Determining whether Johnson referenced weapons and/or threatened a fatality, therefore, requires weighing the evidence and making credibility determinations.

The fact that the postal police found mace in Johnson's pocket and a knife in her car does not alter the analysis.  A jury reasonably could draw a number of inferences from that evidence, including that Johnson carried the items for self-protection.  And although Johnson allegedly told USPS investigators, "I don't know what I said" and "[I] [d]id not mean it" (Oct. 9, 2013 USPS Investigative Memorandum ¶ 7; *see also* Def.'s Reply 5), she also made statements to the investigators that are consistent with her version of the events.  Namely, she stated that it was Campbell who referenced weapons and that she "did not recall" making "a threat towards Saddler to Campbell."  (Oct. 9, 2013 USPS Investigative Memorandum ¶ 7.)  Finally, even if it is true that Johnson "has threatened to shoot other supervisors" (*see* Def.'s Reply 5)—an allegation that Johnson denies (*see* Pl.'s L.R. 56.1 Resp. ¶ 12)—a jury reasonably could decline to conclude that Johnson also specifically threatened violence on September 9, 2013.

In arguing that Johnson has failed to raise a genuine issue of fact concerning job performance, Defendant also contends that she has offered no evidence that she was performing her duties adequately; that "working includes interacting with coworkers"; and that Johnson has a "history of hostile behavior" toward coworkers. (Def.'s Reply 6.) For her part, Johnson has submitted affidavits from her coworkers stating that she is a good employee. Defendant contends these affidavits do not raise a genuine issue of fact (*see id.*), but what unquestionably does is an affidavit that Campbell provided to the EEOC during its investigation of Johnson's January 17, 2014 complaint. In response to the question whether the "requested accommodations relate[d] to [Johnson's] ability to perform the duties required in her job position," Campbell stated, "No. She was doing all her clerk functions. She just did not want Lincoln Park management to instruct her anymore." (Campbell EEOC Investigative Affidavit ¶ 27.) In light of evidence that on September 9, 2013, Johnson allegedly told Campbell that she "did not want Saddler to be her supervisor anymore, or to talk to her or give her any instruction" (Def.'s L.R. 56.1 Stat. ¶ 6), it seems likely that Campbell's statement in the EEOC affidavit referenced Johnson's "clerk functions" on or around that time. And Johnson's job performance "*at the time* of the employment action" is "critical to [the court's] inquiry." *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 901 (7th Cir. 2005).

For the reasons just discussed, a jury could find that Johnson was meeting Defendant's legitimate job expectations. The evidence also permits a conclusion that Defendant treated similarly situated, non-disabled employees more favorably. *See David*, 846 F.3d at 225. "In order for an individual to be similarly situated to the plaintiff, the plaintiff must show that the individual is directly comparable to her . . . in all material respects." *Monroe*, 871 F.3d at 507 (internal quotation marks omitted). "The similarly situated inquiry is a flexible, common-sense one that asks, at bottom, whether there are enough common factors . . . to allow for a meaningful comparison in order to divine whether intentional discrimination was at play." *Id.* (internal quotation marks omitted). "Generally, a plaintiff must show that [her] comparators dealt with the

same supervisor, were subject to the same standards and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (internal quotation marks omitted).

Although Johnson denies referencing weapons or threatening Saddler at all, she focuses her argument concerning comparable employees on other employees who allegedly made threats in the workplace but were treated more leniently: Barbara Lahori, Sherry Holmes, Jeff Quinlan, and Robert Taylor. (*See* Pl.'s L.R. 56.1 Stat. ¶¶ 28-29; Pl.'s Opp. 11.) According to Johnson, she "personally observed" Lahori and Holmes "threaten[] each other" and "personally observed" Quinlan and Taylor threaten to fight each other. (Pl.'s Opp. 11; *see also* Johnson Dep. 54:12-56:2.) Yet USPS did not call the postal police or put any of those employees on emergency placement. (*See* Johnson Dep. 55:24-56:18.) Defendant contends that Lahori, Holmes, Quinlan, and Taylor are not relevant comparators because Johnson has not stated whether they had the same supervisor or job as she did; whether they were subject to the same standards; or whether they were disabled. (*See* Def.'s Reply 7 (citing *Johnson v. Advocate Health Hosps. Corp.*, 892 F.3d 887, 898-99 (7th Cir. 2018) (disregarding evidence regarding comparator because the plaintiff did not state, among other things, whether she and the comparator shared a supervisor or were subject to the same standards); *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 940 (7th Cir. 2003) (requiring a showing that the plaintiff and the comparator "dealt with the same supervisor, were subject to the same workplace rules, and engaged in similar conduct, but nonetheless received disparate treatment for no apparent legitimate reason").)

Defendant's attempt to undermine the relevance of Johnson's comparators is unsatisfying, at least for Quinlan and Taylor. Johnson testified that those employees worked at the Lincoln Park station (*see* Johnson Dep. 54:12-15), so it is reasonable to infer that they were governed by the same workplace rules—or, at a minimum, rules concerning threats to coworkers' health and safety, which presumably apply regardless of position and rank. Moreover, because Hall supervised employees of varying seniority (*e.g.*, Johnson, Saddler, and Campbell), it is

reasonable to infer that Hall played some role in supervising Quinlan and Taylor. Further, according to Campbell, Quinlan and Taylor do not have medical conditions. (*See* Campbell EEOC Investigative Aff. ¶ 23.) And although the evidence does not establish that Quinlan and Taylor threatened fatalities (*see* Def.'s Reply 7 (arguing that "a verbal altercation between two co-workers is not comparable to a threat to kill a supervisor")), Johnson testified that Quinlan and Taylor "were saying they were going to whoop each other's a-s-s, come outside." (Johnson Dep. 55:11-13.) That is a threat of physical violence. The court concludes that "there are enough common factors" between Johnson, Quinlan, and Taylor to allow a jury to meaningfully compare them and determine "whether intentional discrimination was at play." *Monroe*, 871 F.3d at 507 (internal quotation marks omitted).

Johnson's evidence, therefore, is sufficient to raise an inference of discrimination. Defendant has articulated a legitimate, non-discriminatory reason for the adverse employment actions it took—that Johnson posed a serious threat to others (*see* Def.'s Reply 8)—but the evidence would permit a jury to conclude that Defendant's purported reason was pretextual. "In determining whether an employer's stated reason [for an adverse employment action] is pretextual, the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Monroe*, 871 F.3d at 505 (internal quotation marks omitted). "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Id.* (internal quotation marks omitted).

Defendant asserts that the evidence that Johnson had weapons and threatened a fatality in the building "makes clear" that Campbell called the police "because Johnson posed a threat," not because of her disability. (Def.'s Reply 8.) But as already discussed, that evidence is disputed. A jury reasonably could conclude that Defendant did not *believe* Johnson posed a threat. The evidence also permits a finding that Defendant took adverse employment actions against Johnson on September 9, 2013 solely because of her disability: Defendant knew about

Johnson's anxiety and depression as early as May 2013; knew, around the same time, that Johnson's interactions with her supervisors exacerbated those conditions; and ignored Johnson's request for an accommodation for approximately five months. According to Johnson, moreover, Saddler and Campbell cruelly mocked her disability. There is also evidence tending to show that Defendant treated similarly situated, non-disabled employees who threatened violence in the workplace less harshly than they treated Johnson when she allegedly did the same. In addition, Johnson testified that Saddler gave privileges to other clerks at the Lincoln Park post office but refused to do the same for her. (*See* Pl.'s Opp. 12; Johnson Dep. 32:9-33:13 (testifying that Saddler allowed three other clerks, but not Johnson, to change their starting or ending times to fulfill family obligations).) And by Johnson's account, her disability was fresh in Defendant's mind at the time of the adverse employment actions on September 9, 2013. (*See, e.g.*, Johnson Dep. 31:19-32:1 (testifying that just before Campbell called the postal police, Johnson gave her a doctor's note "stating that [she] could not work under a hostile work environment").)

Although a jury might accept Defendant's explanation for calling the postal police, having Johnson escorted from the premises, and putting her on emergency placement, the evidence just discussed raises a genuine issue concerning whether that explanation was pretextual. *See Rowlands*, 901 F.3d at 802 (determining that there was "substantial circumstantial evidence . . . that would allow a reasonable juror to infer that [the defendant's] reason for firing [the plaintiff] was prextual," including that the plaintiff "attempted to discuss her limitations with [her boss] but was rebuffed repeatedly," the plaintiff "alone was prohibited from moving her car closer to the building during her breaks," and another employee violated the policy that the plaintiff allegedly violated, yet "suffered no adverse action"). Setting aside the *McDonnell Douglas* framework, the evidence just listed is a cumulative representation of the record, *see David*, 846 F.3d at 225, and provides a basis for a reasonable conclusion that Defendant took adverse employment actions against Johnson solely because of her disabilities. Accordingly, the court denies Defendant's motion for summary judgment on Johnson's discrimination claim concerning

19

the events on September 9, 2013.

## C.    Other Alleged Discrimination

As noted, Johnson alleges that Defendant ridiculed her disability and deprived her of sharp tools she needed to perform her job duties.  Johnson claims that these actions constitute adverse employment actions taken against her because of her disabilities.  (*See* Pl.'s Opp. 17-19.) Defendant argues that Johnson failed to raise these claims administratively and that the court should therefore dismiss them.  (Def.'s Mot. 9.)

"Before bringing a Title VII claim, a plaintiff must first exhaust his administrative remedies by filing charges with the EEOC and receiving a right to sue letter."  *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019).  The same requirement applies to "an aggrieved employee seeking relief under the Rehabilitation Act."  *Edwards v. Donahoe*, 503 F. App'x 468, 471 (7th Cir. 2013).  After a plaintiff exhausts her administrative remedies, she may bring a lawsuit in federal court "only [for] those claims that were included in her EEOC charge, or that are like or reasonably related to the allegations of the charge and growing out of such allegations."  *Chaidez*, 937 F.3d at 1004.  "Claims are 'like or reasonably related' when (1) 'there is a reasonable relationship between the allegations in the charge and the claims in the complaint' and (2) 'the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge.'"  *Id.* (quoting *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)).  "The charge and the complaint 'must, at a minimum, describe the *same conduct* and implicate the *same individuals*.'"  *Chaidez*, 937 F.3d at 1004 (quoting *Cheek*, 31 F.3d at 501).  The exhaustion requirement "has two purposes:  first, it allows the EEOC and the employer an opportunity to settle the matter, and second, it ensures that the employer has adequate notice of the conduct the employee is challenging."  *Chaidez*, 937 F.3d at 1004.

Johnson asserted only two charges in her January 17, 2014 EEOC complaint:  that Defendant discriminated against her based on her disabilities by (1) having the postal police escort her from the building on September 9, 2013, and putting her on emergency placement,

and (2) denying her requests for an accommodation. (*See* Pl.'s L.R. 56.1 Resp. ¶ 18.) Defendant contends that the court should dismiss Johnson's claims concerning disparagement and tool removal because they were not included in the EEOC complaint and are "not even remotely related to" the allegations therein. (Def.'s Reply 10; *see also* Def.'s Mot. 9-10.) The court disagrees. In the EEOC complaint, Johnson stated that Hall, Campbell, and Saddler were "aware that I was working in a hostile work environment" and "being harassed daily." (Jan. 2014 EEOC Compl. 1.) Johnson, moreover, supported her request for a transfer with, among other things, a doctor's note that stated she was having trouble with her supervisors. Johnson also testified that on September 9, 2013, she told Campbell she "couldn't work . . . under Saddler" because he was creating a "hostile work environment." (Johnson Dep. 31:22-32:1.) When asked what Saddler did to make the environment hostile, Johnson testified that he "would mock my disability" and "treat me unfairly." (*Id.* at 32:9-17.) Johnson testified, as well, that she believes her supervisors removed her tools because she had been in a mental hospital. (*See id.* at 52:20-53:19.) Johnson's claims concerning disparagement and tool removal "describe the same conduct and implicate the same individuals" that allegedly caused Johnson to request an accommodation and to tell Campbell on September 9, 2013, that she could no longer work for Saddler. *Chaidez*, 937 F.3d at 1004 (quoting *Cheek*, 31 F.3d at 501). Even if the EEOC complaint did not expressly reference mockery and tool removal, claims concerning this alleged conduct could "reasonably be expected to grow out of an EEOC investigation of the allegations" in the EEOC complaint. *Id.* (quoting *Cheek*, 31 F.3d at 500). Johnson, therefore, administratively exhausted these claims.

Next, Defendant argues that even if Johnson's supervisors removed her tools or ridiculed her—allegations that Defendant denies—these were "minor," "trivial," sporadic events that did not constitute an adverse employment action, (Def.'s Mot. 11 (quoting *O'Neal v. City of Chi.*, 392 F.3d 909, 911 (7th Cir. 2004)), and were not "sufficiently severe or pervasive" to create a hostile working environment. (Def.'s Mot. 11 (quoting *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 478 (7th Cir. 1996)). Defendant does not discuss the relevant facts from any of the cases it cites.

Johnson, for her part, fails to address any of Defendant's cited cases. She instead offers boilerplate language from still other cases to support the proposition that a "broad[] array of personnel actions may constitute adverse employment actions." (Pl.'s Opp. 17.) From the court's perspective, neither side has sufficiently briefed Johnson's claims concerning alleged disparagement and tool removal. That said, the parties appear to agree that for the claims to be actionable, the challenged conduct must have been pervasive. (*See, e.g.*, Pl.'s Opp. 18 (arguing that "the actions of Campbell, Hall, and Saddler . . . were not isolated incidents").) They focus their briefing on this requirement, so the court will similarly limit its analysis. Defendant contends that no reasonable jury could credit Johnson's evidence that the alleged conduct was pervasive. Specifically, Defendant focuses on statements offered by Johnson's coworkers that Saddler "picked on" her and, on one occasion, acted aggressively in telling her to "pay attention." (*See* Def.'s Reply 10-11 (citing Denise Hynes Ltr., Ex. M to Pl's L.R. 56.1 Stat. [51-14]; Pamela Perkins Ltr., Ex. K to Pl.'s L.R. 56.1 Stat. [51-12]).)[10] According to Defendant, these statements do not "prove" that Johnsons' supervisors ridiculed her for her disabilities. (Def.'s Reply 11.) True, but the statements support such an inference when viewed alongside other evidence. First, Johnson testified that after she suffered an anxiety attack on May 15, 2013, Saddler and Campbell repeatedly harassed her at work by saying things like, "Oh, you was in the crazy house" and "Did you take your medication?" (Johnson Dep. 57:3-58:12.) This evidence plausibly suggests that Hynes' statement about supervisors "pick[ing] on" Johnson referred to disability-related mockery. Second, according to Johnson's former co-worker Linda Campbell, supervisors at the Lincoln Park post office called Johnson "crazy," said "she's a nut," and "created a very unpleasant atmosphere" for her. (Linda Campbell Decl., Ex. P to Pl.'s L.R. 56.1 Stat. [51-17], ¶¶ 3, 7, 9; *see*

---

[10]    Defendant contends that statements by Johnson's son concerning mockery are inadmissible hearsay. (*See* Def.'s L.R. 56.1 Resp. ¶ 21.) Johnson relies on her son's statements without addressing Defendant's hearsay argument. (*See* Pl.'s Opp. 18 (citing Darrius Butts Ltr., Ex. N to Pl.'s L.R. 56.1 Stat. [51-15].) The court concludes that Johnson has conceded the evidence is inadmissible, and therefore disregards it.

Pl.'s Opp. 18 (citing same).)   Linda Campbell also recalled "a female supervisor" saying that Johnson did not need to be using sharp tools, (*see* Linda Campbell Decl. ¶ 8), presumably an allusion to Johnson's disabilities.

The record, moreover, permits an inference that the alleged mockery occurred over many months.  Indeed, Linda Campbell states that she retired in January 2013.  (*See* Linda Campbell Decl. ¶ 2.)  Thus, it is reasonable to assume that her declaration refers to conduct that occurred in January 2013 or earlier.  In addition, as just noted, Johnson testified that Saddler and Deundra Campbell frequently ridiculed her at some point after May 2013.  Johnson likewise testified that on September 9, 2013, she told Deundra Campbell that she "couldn't work . . . under Saddler" because he was creating a hostile work environment.  (Johnson Dep. 31:22-32:1.)  Finally, Johnson's medical records indicate that she was suffering "stress, anxiety and depression relating to stress on the job" as early as September 2012.  (Sept. 17, 2012 Ltr. PL000869.)

Viewed as a whole, this evidence provides a basis for a conclusion that the alleged mockery was because of Johnson's disabilities and was neither occasional nor trivial, but rather pervasive and extremely upsetting for Johnson.  Accordingly, the court denies Defendant's motion to dismiss Johnson's claims that this alleged conduct created a hostile working environment and/or constituted adverse employment actions.

## CONCLUSION

For the foregoing reasons, the court denies Defendant's Motion for Summary Judgment. [43].  Status hearing set for 3/31/2020 at 9:00 a.m.

ENTER:

Dated:  March 9, 2020

REBECCA R. PALLMEYER
United States District Judge